Your Honours, may it please the Court, my name is Paul Spruan, Assistant Attorney General for the Navajo Nation, Department of Justice for Appellant Navajo Nation. I'd like to reserve three minutes for rebuttal, please. Your Honours, between 1931 and 1990, the National Park Service removed 303 human remains without notice and consent of the Navajo Nation from Canyon de Chelly, a place of central importance to the Navajo people. In 2011, the Park Service refused to return them to the Nation at its request. Could I ask you, on the notice and consent, is that undisputed? Because I thought the consent issue was a disputed issue. Am I wrong there? There was no dispute that I'm aware of from the United States that the Nation consented to the removal of those remains. And so they remain locked away in a federal facility in Tucson in defiance of the Nation's wishes to this day. So there was never any consent to removal of the 303. How about the six that were disinterred, I guess, after NAGPRA was enacted? I believe it was the 1980s before NAGPRA, but that was done with the, according to the facts of the complaint, the specific request of the Nation that they be reinterred whenever possible. They were removed temporarily for erosion reasons, but they were not transferred, no title was issued or anything to the United States. It was on the specific understanding that they would be returned. Does the complaint allege, this is a little off subject, but just so I don't forget, does the complaint allege that the remains are more than 100 years old? No, it does not. The two main points the Nation would like to make today is the first, that the Treaty of 1868 recognizes a preexisting right of control that was not overridden by the Native American Graves Protection and Repatriation Act, and the second, that the Archaeological Resources Protection Act separately and independently recognizes a right of control that was not overridden by NAGPRA. Is there anything in any of these documents or the statutes that states that the government has to return these items, or is that just an inference from this right of control and right of ownership? That is an inference. I think it's based specifically on NAGPRA in the sense that the United States is not at possession or control. Also, under ARPA and the Treaty, that ultimately the disposition of these must be done with the consent of the tribe. So that's at the end of the story, the disposition. So NAGPRA has a process for those items that are in the possession or control, and there's some definition with respect to museums that possession control requires a legal interest. But if NAGPRA were not applicable because of that language, is there anything that prevents the government from merely retaining those items? Our position is that the Treaty is one of those items that requires the return upon the request of the nation and also ARPA. It's not explicit. There's not? Yes, ma'am. It is not explicit, though it is retained within those particular documents. And particularly the Treaty, we think, is sort of the first document that sets the whole scene for all of what came later, much later, 1979, 1990. And that talks about the use and occupation, the exclusive use and occupation of the Navajo people specifically to Canyon de Chelly. So let me also ask another argument that I understand the government to be making, is that human remains are different and that the sort of property ownership right in land and other resources doesn't extend to human remains. What's your response to that? Yes, ma'am. I think the Federal Government has been completely inconsistent on that point. If you look at ARPA, if you look at its regulations, which have not been amended after NAGPRA, there's at the very least a concept of control. If you look at the post-1990, how you would deal with that, it talks about ownership or control, and it talks about human remains and other cultural items. So clearly, even under NAGPRA, there's a concept of control, the right of controlling its disposition, the right, we believe, to prevent it from being removed in the first place, and once we know it has been removed, to be returned at our request. And so whether we call it a property right or ownership, even under NAGPRA, there's a sense of control. So we can look at it in terms of this right of control that starts from the Treaty that is independently supported by ARPA and was never overridden by NAGPRA in any sense. And going back to the Treaty, we believe that Canyon du Che, a place of central importance, indeed called sacred in the legislative history of the Canyon du Che Monument Act, creates that exclusive use and occupation, and therefore the right to control the removal of human remains. What about the Antiquities Act? You didn't mention that in your discussion of control. Right. Legal interest. Yeah, and we think that the Antiquities Act could not create a separate legal interest, could not give possession or control. It gave at most physical custody of these remains to be held by the United States until the Navajo Nation requests for their return. So there's a permit process where you can remove them, but even under the regulations of the Park Service, particularly 36 CFR 79, referring to what you do with these collections, the Antiquities Act is one of the authorities. ARPA is one of the authorities. Curiously enough, NAGPRA is not. And it says that the tribes have the right to control disposition. Exchange, removal, moving it from one repository to the other, or even repatriation has to be done with the consent of the landowner here at the Navajo Nation. I'm sorry. You're talking about what document now? This is 36 CFR Part 79. The regulation. Yes, ma'am. These are regulations. So even assuming that we agree that the treaty says the Navajo Nation's control over this area extends to the human remains, the key question here, of course, is, so what gives you authority then to sue the government? Where has the government waived its sovereign immunity? Yes, and interestingly enough, in the United States brief, they talk about the merits and the sovereign immunity question essentially being merged. It appears that's what the district court did here. They essentially said there's no final agency action because NAGPRA applies. There's no 706 jurisdiction because there's no discrete agency action. Well, let's start with 704 and final agency action. What is the final agency action here? The 2011 letter of the Park Service refusing to return it upon the Nation's demand. Because you think significant legal consequences flowed, or what makes that final? We think because significant legal consequences flow, because essentially the Park Service is saying, we don't have to give it back to you, we're not going to give it back to you, and we're going to follow a process. What it's saying is we're going to do this cultural affiliation process to figure out whether these can be traced. I'm speaking unforgivably in shorthand, but your time is ticking. It's not a statement that they won't be returned or repatriated. It's a statement they won't do it immediately. We won't do it now. Right. We won't do it now. That's the final action. Because that's what we asked for, and that's what we believe as a legal matter. There is no cultural affiliation process that can be done here. NAGPRA, Section 5 and 7 simply do not apply. But that goes to my initial question, which is, even if NAGPRA were not applicable, the government, that doesn't immediately spring into life some other requirement, that the government return the remains to the canyon. It does mean that any disposition has to be done with the nation's consent, and it does mean that any action that they take. Now, we believe that under the treaty and under ARPA, though not explicit, that means if we are requesting that they be reinterred because they are ultimately our property as recognized by ARPA in the treaty, they must be returned. There's no discretionary right of the U.S. to refuse to do it and just hold on to it indefinitely. But there's nothing that says they can't either. I mean, they have for now how many years? It's for decades, correct? Right. It's been a number of years, and we weren't aware of it until fairly recently. Right. Yeah. And so it is not an explicit requirement, but we believe it's implicit in all of the documents that lead up to NAGPRA. So the government argues, well, at the end of the NAGPRA process, then you would have an ability to challenge if the remains weren't repatriated to the canyon, the Navajo Nation. Why doesn't that preclude it from being final agency action when there's an opportunity to challenge it at the end of the process? And, again, we believe the cultural affiliation process itself, the time it takes, the fact that it apparently is essentially predetermined. If you look at the facts that were inserted into the response brief of the United States, they've essentially decided already that these are ancient Puebloans, therefore they're more culturally affiliated with the Pueblos. But the point of it is, regardless of their decision, the claim is you shouldn't do that. You can't do that. You don't have the authority to do that. It has to be returned to us. But you can make — Forgive me. I'm sorry. I'm interrupting. I can wait. You're presiding. You outrank me. Go ahead. So — but those same arguments can be made at the end of the process. And so the only argument, then, is delay. And because the government doesn't have any obligation to immediately return them, then it's hard for me to understand why that makes this letter in 2011 a final action. And in the complaint, one of the claims for relief was immediate return. And from the facts of the case, the awareness that the nation, that the Navajo people have, that they are in Tucson locked away for some extended period of time, in and of itself is a harm to the Navajo people. When you say the ancient — coming from Arizona, let me ask you. When you say the ancient Pavlons, what — are those — is that a tribe that's — are you referring to some tribe that they could give the remains back to now, or are you talking to the — about the Anasazi or somebody like that? I mean, these are identifications the United States makes in its response brief. These were not facts that were — Well, what do you — I just am asking, what do you understand that to mean? Given what is referenced in the response brief, which we're not stipulating to those facts, it apparently is some sort of ancient people. Ancient. So it could still — Meaning they wouldn't be repatriated. Meaning that you do a cultural — Because they can't be traced. Or they could repatriate them to New York. You do a cultural affiliation analysis to decide who is the most culturally affiliated tribe or tribes to these people they have denoted as ancient Pavlons. Again, these are not — these are not classifications and distinctions the nation is stipulated to. I'm trying to figure out what you meant. This is not that hard. What did you mean when you said that it's apparently preordained? I certainly understand this isn't a stipulation. Sure. But what did you mean by that? Sure. If you look at the description in the statement of the case of the United States, they insert all of this discussion about ancient Pavlons, and there's a footnote discussing, well, there are some people that are Navajo who have clans and ancestry from ancient Pavlons, but really Hopi and Zuni are more connected. Okay. So you meant preordained, meaning the Navajo Nation isn't going to get them back. That's your concern anyway. Right. All right. And you're inferring that from their litigation position in their briefs. Yes. Right, right. So where is the strongest argument you have that your client is entitled to immediate return? Yeah. And we do believe, because of the treaty and because of ARPA, that those particular sources — Okay. Is it the — Yes. In ARPA, if you could help me out, I read ARPA — I read it again this morning, believe it or not. Archaeological resources excavated from Indian lands remain the property of the Indian or Indian tribe having rights of ownership over such resources. Yes, ma'am. It doesn't say over such land. And so I'm trying to figure out whether this simply means that even though cremated remains have been excavated, that they still remain the ownership of the tribe that — remain the property of the tribe that owns them. Right, right. As opposed to the property who owns — forgive me, as opposed to the tribe who owns the land. Right. And that has been interpreted particularly if you look at 36 CFR 79, which are also ARPA regulations. They specifically talk about jurisdiction over the land. And so it's the jurisdiction over that land set forth by treaty by Canyon Deshaies. I'd like to — And that's the answer to the question. This is really important, so — Sure. Yes, ma'am. That's the answer to the question. I have to look at ARPA and 36 CFR 79 to figure out why the nation is entitled to the return of the remains immediately? At the very least, the NAGPRA's cultural affiliation process does not apply. Therefore, their position that they have to do it is incorrect and that we have an immediate return. Thank you. But the best I found in ARPA, going to that point, is it says any exchange or ultimate disposition shall be subject to the consent of the Indian or Indian tribes, which owns or has jurisdiction over such lands. That's in the statute. But that relates to ultimate disposition, which would seem to be arguably at the end of the NAGPRA process, they could — your client could sue to enforce its ARPA rights. Because at this point, there is no ultimate disposition. There's just a retention by the government. And refusal to give it back. And refusal to give it back. I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you. May it please the Court, I'm Mary Gabrielle Sprague, representing the National Park Service. I believe the Court should begin with the text of NAGPRA. NAGPRA Section 5 is the provision that requires the Park Service to prepare an inventory of the cultural items that were in its possession or control as of November 16th, 1986. 1990. There is no exception in the text of NAGPRA for cultural items that were excavated from Indian lands. So the regulations — this is what the opposing counsel's points do. Your regulations define possession or control in the context of museums as including some legal right to the remains. And so NAGPRA only applies to an agency or museum which has possession or control of these items. So the argument is the government never had legal possession or legal control over these items because they were taken without consent and in violation of the treaty. Correct, Your Honor. That's their argument. The possession or control standard is a very minimal standard. It's the legal interest of a custodian. It's not the legal — the ultimate legal right to the cultural items. So let me get this right. You're not arguing that the National Park Service's right to possession or control stems from the Antiquities Act? It does, Your Honor. I'm about to get there. It's a low standard. And in here, in this case, the Antiquities Act gave the Park Service the right to authorize certain excavations in Canyon de Chelly, which did take place. And so were they before ARPA was enacted? So were the remains taken between the Antiquities Act and ARPA? Most of the remains are. And, Your Honor — For most of them? Is that factual? Is there a factual dispute? Or do we know — is that in the record when the remains were removed? The complaint is in the record. The Navajo Nation has received a draft inventory, so when it — which is not made part of the record because this was litigated in the district court on motions to dismiss. But the Navajo Nation has a detailed draft inventory. So when it expresses no understanding of the facts at all, that is simply incorrect. Okay. But that's not in the record. That draft inventory is not in the record. Okay. So let me get back to the — your argument that it's about custodial rights, because the definitions in your regulation say possession means having physical custody of human remains. But then it goes on to say, with a sufficient legal interest to lawfully treat the objects as part of its collection. So it's not limited to just custodial rights. I mean, it's legal and lawfully twice suggesting that you have to have some legal right to these items in the collection. But that legal interest is explained in the terms of whether it's on loan to the federal repository from a museum, for example. It's to sort out who has to do it. It's not to eliminate items from the inventory process. It's to cast a wide net and to make sure somebody does it and specify who. It typically comes up where a museum says, no, I'm not going to do it. So the regulations have two sentences. The second sentence is about things on loan. And so your argument is that if we read that regulation in context, applying normal cans of interpretation, we would say legal interest really is irrelevant to the particular case before us. Is that what you're saying? Because here it isn't that the items are on loan or there's a dispute between two museums. It's a dispute that the Navajos say the government has no legal interest in these items. Right. For purposes of the requirement to do the inventory, the National Park Service has physical custody. It's not taking the position that these are on loan. And so it believes it has the obligation to move forward. But that's like saying we've got them, so we have a legal interest in them. That's why I asked, and maybe I misunderstood your briefing, but it's a very important point. It can't just be that because the National Park Service has these in its coffers that the National Park Service has a legal interest to them. That's not your argument, is it? No. We do have the right of custody to these artifacts under the Antiquities Act, and that the circumstances of them coming into the possession of the National Park Service were not developed in the record in the district court because of the way the case was litigated. Go ahead, please. So we have these canons of interpretation of statutes, and we say there has to be – there are no repeals by implication of the rights given to the Indians in treaties. And so how do we read the Antiquities Act in that light? Did that repeal the treaty to the extent that it gave the Indians full position control of everything in their reservation? Well, Your Honor, the first question that will ultimately have to be decided, but I think not in this case, is whether the treaty gives the Navajo Nation a property right in the human remains that were within the treaty reservation if those – if the deceased were not their ancestors, if they are culturally affiliated with other tribes. And you – if we're trying to deal with sovereign immunity, you are asking us, you are merging the analysis, and now you're asking us to make the end decision about legal interest in order to determine waiver of sovereign immunity. In terms of the right to prepare the inventory, for purposes of Section 5 of NAGPRA, which is the right or the obligation to prepare the inventory, yes, that we believe that that is a decision this Court should make. The ultimate question of who ultimately is entitled to the remains based on property rights we think is not right for this Court's consideration. Yes, but – so let me just back up, because now you've raised a different question. Is – am I correct that the inventory has been prepared? Is that process done, and now you're moving into the cultural affiliation process? There is a draft inventory that has been in a very complete form since the 1990s. The process was impeded by the Navajo Nation's decision that they were going to assert a property interest. Typically what happens – But you can imagine their frustration if 20 years have gone by, and this process is taking a very long time. It would have been finished absent the claim that they have the sole rights, that there was a consultation process that was going forward that involved the Hopi Tribe and the Pueblo of Zuni and the Navajo Nation, and had that process been – When did that start, after the inventory? There was a draft inventory, Your Honor, I think as early as 1996, which is very detailed. It lists each of the archaeological sites, the researcher, the dates, and then goes for each site, goes into a detailed description of each of the items. And then you're supposed to give notice, is that – Right. And then when that is completed, but in the preparation of that inventory, there is a consultation process, and then the notice of inventory completion is published, and tribes – So when was the notice of inventory completion published? It has not been published because the dispute has stopped the process. Typically what happens is that through this consultation process, if multiple tribes are involved, they will work out among themselves what the end repatriation plan will be. There will be a coming together of where and how the remains are to be repatriated. Now, that doesn't have to happen because there's the inventory, there's the request, and then there's a final decision. But typically it's part of a process where the tribes come together. The point of the statute is to rebury remains with respect. So why wasn't the decision in 2011 that NAGPRA would apply the letter that was sent to the Navajo Nation, why wasn't that a final agency action? It determines conclusively that the NAGPRA process will go forward. So under cases like Hale v. Norton, which said you shouldn't make the aggrieved party wait while you're going through this process, that deprives them of the protection that they're entitled to. So why wasn't that a final agency action? Your Honor, because there is an administrative process that Congress directed that would follow. But the way we've presented this case to this Court is that what they wanted an answer on, we are saying they can get an answer on, because to decide whether it is final agency action, you have to construe ARPA and you have to construe NAGPRA. When you get to the end of that ---- But that's a legal question, right? So the only question they're saying now was the final agency action was a legal determination by the government that NAGPRA was applicable to these remains. And so that's a very clear legal determination by the Department. That was their final determination. You are going forward with the NAGPRA process. So why couldn't a court say that decision is final and now reviewable under Section 704, or that the sovereign immunity was waived under Section 704 of the APA? Because there ---- that Congress intended a process to be completed, and that question could be reviewable at the end. They haven't brought a delay claim. They could bring, but they didn't. Okay, wait, wait, wait. Before you get to the delay claim, because I have a question about that, too. So the standard about whether this is or is not a final decision, we've said, the rights and obligations were determined, or do legal consequences flow? And his argument is, yes, legal consequences flow. It's a real fork in the road about this other cultural affiliation process. And in fact, it's a fork in the road 20 years ago for the inventory process. This is ---- it embarks on a long journey. Why isn't that sufficient? But, Your Honor, what we're saying is you can decide that question because that merges with the question of whether it is final agency action. We can decide it now? You can decide whether NAGPRA Section 5 applies and requires the National Park Service to prepare the inventory. We have agreed that because to answer that question, you have to construe the statutes the same way you would have to construe it to figure out if it's final agency action. By the time you get there, you've decided the question. And we think you can decide and should decide that NAGPRA Section 5 requires the National Park Service to prepare an inventory. But what they then want, which we argue is not final agency action, are their breach of treaty and takings claims that we say are not ripe because there's been no determination about to whom the remains will be repatriated. Are you saying, are you conceding that there was a waiver of sovereign immunity with respect to the question whether NAGPRA was applicable, but no waiver of sovereign immunity with respect to their ultimate question about whether they're entitled to get the remains back? Well, Your Honor, we rely on the Mashery case. I thought you were arguing the reverse of that. You're relying on what? The Mashery case. I mean, this is really important to me. Now you've totally lost me on whether you are agreeing or not that there's a waiver of sovereign immunity, about whether this is a final agency action. I don't believe there is a waiver of sovereign immunity, but to figure that out, you have to construe the statutes, and that gets you to the place of deciding that the National Park Service has sufficient legal interest, they have possession or control to proceed with the inventory. So your answer to Judge Ikuto's question is no, the one you didn't answer. There's no sovereign immunity for the repatriation. And I don't believe there's a waiver. Is there a waiver of sovereign immunity for the decision that NAGPRA is applicable? No. I think not technically a waiver of sovereign immunity. Now, in your view, when was the decision that NAGPRA was applicable? When was that made? When was that made? When the Park Service commenced the process in the 90s. In the 90s. And I'm a little confused now as to where we are right now in the process. So there is a draft inventory, and if the decision is made that the Park Service has the right to prepare a draft inventory, the work will be done to finalize that. Are you saying that our decision today? Yes. Because our decision is focusing on whether there was a waiver of sovereign immunity. The district court dismissed the case based on no waiver, and so it didn't address the merits. So you're saying we should address the merits of whether NAGPRA is applicable? The same decisions that the district court made to dismiss for lack of sovereign immunity support a conclusion on the merits that NAGPRA Section 5 applies. It's just how you ---- So is your answer yes? Is your answer to that question yes? It would really help me if you would answer that question. You didn't answer it. Yes. We're asking for a decision on the merits. But in the alternative, if you don't agree that the merits question merges with the sovereign immunity question, then our position is there's no waiver of sovereign immunity. The building blocks of the decision, we think, lead up to a certain point, and then you can either decide the case, interpret Section 5 on the merits, and conclude that there's no immediate right of repatriation under ARPA on the merits, or for those reasons, you can then conclude that there's no waiver of sovereign immunity. I interrupted you a minute ago. Were you getting ready to say, which I think is right, but I just want to clarify, under 706 of the APA, is it correct that the tribe has not made an argument under 706 for unreasonable delay of NAGPRA? Correct. Their argument is that it shouldn't be done at all. And their position is the reason for the delay. They have not made the argument. But under 706, they are making a 706 argument, right? It's just not under NAGPRA. Under ARPA. Right. Okay. Yes, Your Honor. For unreasonably withheld agency action is their theory. Yes. Under ARPA, which we say there is no requirement, and which the district court held there was no requirement, and the district court couched the finding, the conclusion is one of sovereign immunity, by the time you get there, our argument is you've construed the statute, and on the merits, you can hold that NAGPRA applies, ARPA doesn't apply, the inventory should go forward, the Park Service will publish the inventory, claims can be made, and if there are multiple claims for the remains, there's a review committee established under the statute that can facilitate. Judge Akutu, would you let me ask one more question? Of course. One more question, I promise. I'll just be quick. I asked opposing counsel the question about ARPA and whether this following phrase should be interpreted to apply as the way I'm reading it. And this is the phrase that says, Archaeological resources excavated from Indian lands remain the property of the land. Is that ownership over such resources? Does that refer to ownership of the land or ownership of what's been removed from the land? I believe that refers to what has been removed, and that is a prospective provision from excavations 1979 forward. But I do believe that refers to the items removed from the land. So that would tell us that whether it's in a museum or not, just because it's presumably, but it would leave the question of which tribe. Is that your position? I think the landowning tribe under ARPA, the landowning tribe does have the right of disposition for the resources from 1979 forward. Now, where there was consent under ARPA and the item came into the physical custody of the Park Service, during that 1979 to 1990 period, there is a question as to what the rights would be in that property. But that would be sorted out in the future. Opposing counsel said there was no dispute that the Navajo Nation had not consented to the removal of the remains. Do you dispute that? I do dispute that, Your Honor. Certainly, whether there was advance notice in a form filled out as these excavations were being conducted over the years, I don't know of that evidence. But this was not carried out in the dead of night. These were excavations.  They're published. This is part of the common understanding of Anasazi Southwestern prehistory. The history of Canyon de Chelly is well documented. And if I could just say, these issues have not been predetermined by the National Park Service to the extent that the brief I wrote makes it appear that there is a predetermination. That's my fault. But to have an opening brief about Canyon de Chelly that does not even acknowledge the well-understood prehistory, I felt that the Court needed to have an appropriate context for background. What's the significance of the fact that the complaint doesn't allege the remains are at least 100 years old? Your Honor, in the opening brief, the Navajo Nation pointed out that they could easily amend, because they know, we know, yes, that's true, because there's a draft inventory. And, yes, for us to have said ARPA doesn't apply because it wasn't properly alleged, they would have wasted your time. Thank you. Because they could have amended it. Well, let me, can I just ask one more question? I simply, I'm not quite sure I understand if you're, you seem to be acknowledging that these are ancient, these remains belong to tribes that are long gone or not. You're not doing that? No, Your Honor. I mean, I think, this is not the first repatriation of Anasazi remains in the southwest. And it has been determined in other situations that the modern Puebloan tribes are culturally affiliated with these remains. These are not culturally affiliated. Okay. And that would not be the Navajo? The Navajo have been determined in certain circumstances to be culturally affiliated. In some circumstances, there are some Navajo, members of the Navajo tribe who have ancestors who are also Anasazi. There's been a long period of contact. But it's generally understood and has been held in other NAGPRA repatriations that the modern Puebloan tribes and in the area of Canyon de Chelly, the Hopi and the Zuni are culturally affiliated with the Anasazi. That answers my question. It would have taken you way over your time. Thank you very much. If I had been clearer, you wouldn't have needed to. Thank you. Thank you, Your Honors. I have a minute and 30 seconds left. Some quick points. First, the concept of possession and control applies both to Federal agencies and museums by the statute. The National Park Service agrees with that. They're frequently asked questions in glossaries and guidance, which are in the addendum, talk about possession and control and those definitions in both contexts. Second, again, we've heard that custody is enough, that custody creates sufficient legal interest. That's patently inconsistent with the Park Service's own regulations and guidance that are in the addendum. Why is she wrong that under the Antiquities Act that the Park Service doesn't have sufficient legal interest under the Antiquities Act? Why under the Antiquities Act? Because the regulations that have been passed fairly recently have essentially said the tribes still have the right of disposition. We filed a response to the notice. Ultimate disposition, but this goes back to the question about immediate return. You're requesting immediate return. Did you want to? Well, we're also requesting for declaratory judgment that in fact we own these items or at least have a property interest and that the Park Service does not. Well, the Antiquities Act does say that the government can remove these things with no limitation. And we don't believe that's consistent with our treaty specifically. And that goes back to the treaty, which I've heard no discussion, objection, argument whatsoever that our treaty right does not apply in this circumstance. If you look at the brief of the United States, they have one paragraph that says basically nothing about the understanding of the Navajo Nation, the language of the treaty, or anything remotely like disputing that. But thank you. Questions? All right. We thank you for your argument. It was very illuminating. In the case of Navajo Nation, the Department of the Interior is submitted. We have the students from Santa Clara Law School in the audience. We're going to recess and confer. And when we're done, we'll come back and are happy to talk to the students and whoever else wants to remain. With that, we're adjourned for the day.
judges: Schroeder, Ikuta, Christen